CENTRAL RY. SIGNAL CO. v. METALLIC SHELL & TUBE CO.

(Circuit Court of Appeals, First Circuit.   October 17, 1916.)

No. 1206.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT.
    The Jackson patent, No. 824,019, for a track torpedo, claims 2 and 3, are void·for lack of invention, in view of the prior art; also *held* not infringed, if conceded validity.

2. PATENTS ☞328—INFRINGEMENT—RAILWAY TORPEDO.
    The Beckwith reissue patent, No. 12,396 (original No. 790,879), for a railway torpedo, *held* not infringed.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Suit in equity by the Central Railway Signal Company against the Metallic Shell & Tube Company.   Decree for defendant, and complainant appeals.   Affirmed.

For opinion below, see 228 Fed. 909.

A. S. Pattison, of Washington, D. C. (James H. Thurston, of Providence, R. I., on the brief), for appellant.

Horatio E. Bellows, of Providence, R. I., for appellee.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

BINGHAM, Circuit Judge.   The complainant, the Central Railway Signal Company, is the owner of United States letters patent No. 824,019, issued to Wilton D. Jackson, June 19, 1906, on his application filed December 26, 1903, and No. 12,396, granted to Charles E. Beckwith, the same being a reissue of patent No, 790, 879, and issued May 30, 1905, on an application originally filed October 5, 1903, and complains of their infringement by the defendant, the Metallic Shell & Tube Company.

The two patents relate to torpedoes used for railway signaling purposes.   Speaking broadly, a railway signal torpedo comprises, first, a torpedo proper, and, second, means of attaching the same to the rail. The torpedo proper consists of a shell containing explosive material. Various materials are used for the shell, such as paper, fiber, lead foil, tin foil, and the like.   If hard metal is used, danger is likely to result from flying particles.   To secure the torpedo to the rail, means are employed which will engage both the rail and the torpedo.   Flexible metal strips of a pliable nature, such as lead or wire, are commonly used for straps.   When a nonmetallic substance is used for the shell, it is customary to waterproof it, by applying varnish, paraffin, or some such waterproofing compound.   When metal strips are used for the straps, and the material for the shell is of a fibrous nature, or different from the metal straps, various methods are resorted to for securing the shell to the strap; but it is obvious that, when the straps and the shell are made of the same material and in one piece, the problem of devising means to secure the straps to the shell does not exist.

In the patents in suit the strap and shell are made of different ma-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

terials, and the chief problem confronting the patentees consisted in devising means of attaching the strap to the shell or container.

The claims in the Beckwith patent, No. 12,396, in issue in this suit, are Nos. 2, 7 and 9:

"2. A torpedo of the class described, comprising a tubular envelope of substantially flat cross-section, the ends thereof being closed over upon the body of the envelope, and a carrier for such envelope, said carrier adapted to clamp the turned-over ends to close the same moisture-tight, said carrier adapted to be clamped to the rail."

"7. In a torpedo, a substantially flat tube closed at its ends by having said ends doubled over upon it, an explosive compound contained in said tube and retained therein by said closed-over ends, a carrier member for the envelope thus constructed, the same adapted for clamping the envelope to the rail."

"9. An improved torpedo, comprising a case composed of a section of a fiber tube with open ends, a carrier applied thereto and extending longitudinally the tube, the ends of the carrier bent over upon, clamping and holding the ends of the tube closed."

The claims of the Jackson patent, No. 824,019, here in issue, are Nos. 2 and 3:

"2. As a new article of manufacture, a track torpedo, comprising a casing of paper having a filling of detonating material exploding under pressure, means for securing said torpedo to the head of a rail, and means encircling the body of said torpedo for retaining said securing means thereto.

"3. As a new article of manufacture, a track torpedo of tubular shape, having a filling of detonating material exploding under pressure, means for securing it to the head of a rail, and means encircling the body of the torpedo for retaining said securing means thereto."

In the Jackson patent, the patentee states the construction of his device to be as follows:

"The torpedo, made in accordance with my invention, consists of a tube 1, which may be of paper, fabric, papier-mâché, wood, or other similar substance suitably prepared, and in the present instance I prefer to use waterproof paper. Within this waterproof tube is carried a detonating material 2, * * * and to secure this material in place I provide plugs 3 for the ends of the tube, which plugs may be of wood, the material of which the tube is composed, or of any suitable friable substance. The tube is preferably varnished, and the plugs are also varnished, so as to insure a waterproof condition and render the torpedo available for use in all kinds of weather. The torpedo is held to the rail by means of a strip of flexible material, such as lead, * * * and while the lead may be held in place in several different ways, I prefer to provide a secondary or supplementary tube 5, which will encircle the tube 1, carrying the detonating material, and will thereby provide an inexpensive method of securing the lead in place. * * * In lieu of a complete tube I may provide tubular bands to secure the lead strips in place."

In the Beckwith patent, No. 12,396, the patentee describes the construction of his device thus:

"In the figures, A is a container for the usual explosive compound. * * * Said container consists, preferably, of a short length of tube, as shown in Fig. 5, which may be of a good weight of paper of tough quality, or of other suitable material that will break easily by the expansion of the explosive therein contained. In practice I employ a fiber paper, such as cartridge paper or the like, though, as stated, other material may be employed to good advantage—such, for instance, as sheet lead. It is to be kept in mind, however, that my purpose, in addition to the objects above stated, is to provide a torpedo that, when exploding, will have no pieces of solid material likely to in-

jure any one, even when close to it, so that it is important that the container A be of some substance that will tear open rather than fly into fragments. The tubes are cut into the desired length, and then by means of a suitable press or other implement the short lengths are flattened substantially, as shown in Figs. 7 and 8, the ends a a being turned up and over at the same time, so as to form a permanent crease, whereby the ends so turned will naturally close over by the stiffness of the paper and normally remain in that position. The envelopes or containers thus formed may now be immersed in any waterproofing fluid—such, for instance, as paraffin, asphaltum, varnish, or the like—after which they are filled with the explosive mixture and are then ready to be attached to a suitable carrier.  *  *  *  This carrier (designated by C) consists of a piece of sheet metal formed with upturned ends D and of substantially the same length as the container and within which the latter is placed. However, before placing said container within the carrier, a clip composed of a strip of lead F is first laid upon the carrier, there being points pressed in the said carrier from the back, as at E, to form a retaining means for the said strip.  *  *  *  The said strip, when clamped between the container and the carrier, is held tight enough to hold it in place and in turn properly holds the torpedo to the rail; but I prefer to use the points E to form more friction on the strip when so clamped in place, especially if the clip be of lead."

He then stated that the parts are assembled—

"by first providing the carrier C with its projections E, then placing the strip F upon it, followed by the container A. When thus put together, they are placed beneath a die, which when descending serves to close down the ends D of the carrier upon the turned-over ends a a of the container in a tight manner, and, in fact, this is so firmly done that it is an impossibility for any moisture, however slight, to enter the container. If preferred, the device thus completed may be dipped into a waterproofing material and is then ready for use."

In the defendant's device the explosive material is placed in a small envelope of thin paper in such quantity as will permit it to be rolled in a cylindrical form to be placed within a tube of thin lead foil. The end portions of the foil tube are flattened to form lead straps of sufficient thickness to serve for connection with the rail; the flattening beginning such a distance from the ends of the cylindrical package as not to rupture the lead tube.

In the District Court it was found (1) that claims 2 and 3 of the Jackson patent were invalid, and (2), if valid, they must be limited to what was new with Jackson, and, so limited, the defendant did not infringe. And as to the Beckwith patent, No. 12,396, that if the claims were valid, the defendant did not infringe them, as they had no application to a structure like the defendant's which involved no problem of uniting a separate case to a separate leaden strap.

[1] We think that the conclusions reached by the District Court as to both patents are right. The materials used had long been employed and were well known in the art at the time the patents in suit were applied for, and, if the particular means adopted in the Jackson patent for connecting the torpedo to the strap were not disclosed in the prior art, we are of the opinion that, inasmuch as the disclosure consisted in nothing more than passing a band or bands of greater or less width about the metal strap and the body of the torpedo or shell, a thing obvious to any one attempting to solve the problem, if it can be called a problem, it does not involve invention. If, however, this were not so, the prior art as disclosed in the patents issued to E. G. Beckwith, No.

501,399, and to Hickman, No. 173,291, clearly discloses means anticipating the broad claims of the Jackson patent here in issue.

In Beckwith, No. 801,399, the shell or torpedo, as disclosed in Fig. 1, is an elongated tube, the flat end of which is closed in any suitable manner. The large end of the tube is closed by a wooden plug or other suitable material, and encircling this end is a "metal band." The metal strap employed to hold the shell or container to the rail is secured to the shell by passing a tack through the metal strap, the metal band and into the plug. The metal band encircling the shell serves as an aid in strengthening and securing the tube to the strap the same as the band or tube does in the Jackson patent, and the device presents the three elements of a container for the explosive, a strap and the encircling means to connect the strap to the container.

The patent to Hickman, No. 173,291, involved the same problem of connecting a torpedo to a strap where the container and strap were not integral. In this patent the torpedo proper or container is spoken of as a pellet. It is there said:

"A represents the usual case or pellet covered by a cap B; and C is a ductile metal strip passed between the case and the cap, and extending below the case for attaching the torpedo to the rail in the usual manner."

Here the ductile strap passed over and around the case or torpedo and was secured in position by recesses formed in the cap which encircled the case or torpedo. It is apparent that in this patent the case was a complete container in itself and that the cap did not form a component part of it. We have here, then, a container, a strap, and means encircling the container for the purpose of connecting the two together, which are the three elements claimed by the complainant as constituting the Jackson device.

The claims of the Jackson patent here in issue are broad claims and embrace, as we have shown, devices of the prior art. If, however, the particular device disclosed in the patent involved inventive thought, and the claims of the patent could be sustained by limiting them to that specific device, the defendant does not infringe, for its device does not involve the problem of providing means of connecting structures composed of different materials. It was old in the art to construct the encircling member and the strap of the same material and in one piece, as shown in the patent granted to Hickman, No. 150,431—a method of construction which the patentee in the Jackson patent precludes himself from using by expressly providing that his torpedo shall be "constructed of nonmetallic material," such as "paper, fabric, papier-mâché, wood, or other similar substance suitably prepared," and that his strap or straps shall be of "lead," or "in lieu of the strip of lead * * * some suitable form of metallic wire or band to secure said torpedo in place." Furthermore, it seems to us, notwithstanding the testimony of the experts, that the pellet spoken of in Hickman, No. 160,431, is the "usual case or pellet" spoken of in Hickman, No. 173,-291, of which the cap B is not a component part, and that the complainant cannot take the position that, if the defendant's device contains the three elements above spoken of, its construction is the equivalent of that of Jackson, and infringes it.

[2] In the Beckwith patent in suit, No. 12,396, claim 9 relates simply to a case of fiber tube and a carrier applied longitudinally to the tube, with its ends bent over upon and clamping and holding closed the ends of the tube. It does not lay any claim to means for connecting the torpedo to the rail. Claim 7 calls for a flat tube closed at its ends by having them doubled over upon the tube, and a carrier member adapted for clamping the envelope to the rail. This claim is specific so far as it relates to the construction of the container, but, so far as it relates to the character of the carrier and its adaptation for securing the container to the rail, it is general. Claim 2 is specific as to the construction of the container and also of the carrier, so far as it relates to its attachment to the container and the function it is to perform by being attached thereto; but as to the means for attaching the shell or container to the rail it is general.

The defendant's structure does not infringe claim 9. Its metallic tube does not clamp and hold the ends of the explosive container, if the thin paper envelope of the defendant's device can be called a torpedo proper or container. This proposition applies equally well to claim 2, and in neither claim 9 nor 2 does the carrier encircle the container. In claim 7 the ends of the flat tube or container are closed simply by doubling them over upon the body of the tube without the employment of any other means for closing them or holding them closed. The defendant does not infringe this claim, for, if its thin envelope may be called a container, its ends are closed by other means than simply turning them over upon the body of the envelope; and, if the claim is to be limited to the specific construction set forth in the specification of the patent, the defendant's device does not infringe, for the ends of the envelope are not closed and held by a clamping device as in the patent to Beckwith.

We are also of the opinion that the District Court was right in holding that the defendant's device does not contain the three elements of the patents in suit; that the ordinary paper envelope containing the explosive, which is rolled into cylindrical form and placed within the leaden tube, does not constitute the defendant's torpedo. As said by the District Court:

"The torpedo of the defendant consists, not only of the explosive charge in a paper envelope, but of the protective shell or lead foil which completely incloses the paper envelope and explosive."

And as it does not involve the three elements of the complainant's device, it does not infringe.

The decree of the District Court is affirmed, with costs to the appellee.